Good morning, Your Honor. May it please the Court, I'm Barbara Valliere on behalf of the United States. I'd like to reserve three minutes for rebuttal. You bet. This is a government appeal from the district court's order dismissing an 851 information filed before trial, which increased the defendant's mandatory minimum exposure from 10 to 20 years based on his prior drug felony. The district court's order dismissing the 851 information on due process grounds was legally and factually without foundation and should be reversed for three reasons. First, prosecutorial discretion regarding what charges to bring is very broad, and here the prosecutors properly exercised that discretion when they filed the 851 information after Mr. Morris had rejected their plea offer. Secondly, the reasons that were offered by the district court in this case for striking the 851 information were legally untenable. And lastly, given that this is de novo standard of review, there are no other basis on this record for the Court to affirm. Well, you take the position that the government can ask the defendant to give up a variety of rights assured him by the Constitution. Where do you draw the line? Supposedly he said we'll give you the deal if you'll give up your right to counsel. Actually, Your Honor, I do not think that we can say that. I think that we can't. Why can't you say that? Because, Your Honor, I think the Court in both Bordenkercher and in Brady has indicated  that there is a determination that the defendant's plea is knowing and voluntary. So I do not think that we could actually condition the defendant's plea. How about some other rights? Suppose you're trying, the government's trying an Islamic terrorist and says we think your problem is your religion and we'll give you the deal if you'll agree never to go to a mosque again. Your Honor, again, I think that that, again, is an unconstitutional condition. And so, therefore, because it is based upon the defendant's religion. There are two constraints on the prosecutor's ability to charge and its discretion. And those two constraints which this Court is recognizing in the people of Guam are, one, don't engage in selective prosecution. So we cannot choose to prosecute someone or condition any of the plea terms on their religion or based upon their race or other prohibited factors. The second is that we can't threaten the defendant with threats for charges for which we do not have probable cause. So there are constraints that this Court and the Supreme Court has put on the prosecutors with regard to plea negotiations. And I think what really is going on in this particular case, Your Honor, is that the Supreme Court has misunderstood the Supreme Court's decision in Bordenkircher and had determined that here somehow the plea bargaining process itself was infirm based on two erroneous reasons. This case, quite frankly, is completely governed by Bordenkircher. It's not only the legal authority. In Bordenkircher, Justice Stewart assumes that there's a rough equality of bargaining position. And in this case, as Judge Patel perceived, you've doubled the sentence. It's really you've – suppose it was the death penalty that you said to him, if you don't go along with us, we'll give you the death penalty. We can. In fact, Your Honor, the death penalty is one of the things that we can, in fact, say that if the defendant doesn't plead guilty, we will go forward with a death penalty prosecution. There's no legal impediment to that. Your authority for that is what? Well, Your Honor, actually the authority is Bordenkircher, because if the facts in Bordenkircher itself are that the defendant at a – at the – after the first arraignment, the defendant had been charged with just simple uttering. The prosecutor walked in after the arraignment and simply said to him, if you don't plead guilty to this on a five-year deal, I'm going to reindict you under the recidivist statute and you'll get mandatory life. The court in – so it has to do with the penalty. But not death. No, Your Honor. But I think that the distinction between the two as to what the penalty is doesn't – is not the distinction that matters in this case. It's simply whether or not the prosecutor has the right to threaten to increase the charges, which would include possibly a death penalty, if, in fact, the defendant does not plead guilty to the indictment. And in Bordenkircher, the court recognized that – and I want to read it to you because it's, I think, critical to this particular case – that the prosecutor did not engage in any kind of indictive prosecution or due process violation simply because of the course of conduct engaged in by the prosecutor they held in this case, in which, by the way, the defendant went from a possible 2- to 10-year sentence to a mandatory life sentence, only presented the defendant with the unpleasant alternatives of foregoing trial or facing charges on which he was subject to prosecution. That did not violate the due process clause of the Fourteenth Amendment. So my point, Your Honor, is that if he's subject to prosecution under a death penalty case, then the fact that the prosecutor threatens death penalty if he doesn't plead guilty doesn't violate the due process clause of the Fourteenth Amendment according to Bordenkircher. That's your inference, but not the holding. It's not the holding, Your Honor. That's correct. And it seems to me in a case like this, he's not facing a death penalty, but there's a real possibility he's facing death from the gang, that if he accepts the deal, he's in he'll be in prison for 10 years and he's testified against the leader of the gang, his own life expectancy has been at the least reduced. I think that, Your Honor, there's two answers to the Court's concern. The first is this Court has already held, and all of the circuits have looked at the question, that the prosecution can, in fact, condition its deal on cooperation. So that's a settled legal issue. And the district court here didn't really rely on the cooperation aspect when she determined that the prosecutors in some way had violated due process. What the second part of that, Your Honor, is that in this particular case, the defendant was being offered quite an opportunity, which was to cooperate against Mr. Cyrus as well and work his way down from a 10-year mandatory minimum sentence, as well as to avoid the enhanced sentence. So it was an opportunity the defendant could reject, which he did. And so it's an opportunity if you think you're going to live through it. Your Honor, I mean, I can go on and on and on about the witness safety protection and all of that, and there were many witnesses that testified in Cyrus, which has already been tried, and there has been no problem. But setting that aside, I think the legal issue that's before the Court here is just simply do the district court have any proper legal basis to actually strike the prior. I think her concern, if the Court looks at the record, was with two different things. One was the timing of the offer that was too early in the process, which, again, has no legal basis. In Bordenkircher, he walked in immediately after arraignment and made an offer to the defendant to plead or face life, mandatory life. And the second concern of the district court was that this was a take-it-or-leave-it offer.  court. I'm sorry? No give and take. That's – I think that was her view, Your Honor, that the – if it's a take-it-or-leave-it offer, which the prosecutor said, quite frankly, in this case, that yes, it was. That's my plea bargaining stance. I generally take a position. I tell the defendant, this is your best offer, and I stand with it, which is poison. The district judge apparently felt that the prosecutor could not give its best and final offer initially, had to, well, double it and then come down half or something. Yes. Is there any case that you've found that substantiates that? None. And the reason for that, Your Honor, is, again, in Bordenkircher, the court discussed that whole issue, that you have to – whether or not you must – the prosecutor should be required to plead to charge heavy and then reduce charges in the plea negotiation process, or whether or not the prosecutor can do what he did here, which is charge light and threaten to increase the charges. And the court said that that – both of those are acceptable, and that the latter of those two, the charging light and then threatening charges, was perfectly permissible under the Due Process Clause. The third area that she talked about was the interference with the truth-finding process. What's your response to that? Well, I think, Your Honor, I have two responses. The first is that, in fact, what the plea bargaining process, which has been recognized as sanctioned by the Supreme Court and others as beneficial to both sides, generally beneficial to both sides, is that generally it leads to enhancement of the truth-seeking process. Here, she cited to a case from this circuit which dealt with misrepresentation of facts to the jurors during a jury trial. So she wasn't talking about anything that happened in the plea bargaining process at all, and her legal support for that was a case that was completely distinguishable. But even setting that aside, Your Honor, I think what you have here is, if there's a problem with what the prosecutor is doing in terms of what it's requesting back from the defense, again, the Rule 11 colloquy, to make a determination as to whether or not the defense is knowing and is – guilty plea is knowing and intelligent, is an important and critical stage of the proceedings. And the reason that the prosecutor made the offer one day and said you've got one day to make a decision, it was from December 18 until January something or other that was going on. But I think the question that she raises is one that's worth looking at, and that is this, that we have these fast tracks now where the government attempts to get the bargain done early on rather than the night before trial, and it's going on quite substantially in our circuit, and I think other circuits are picking it up. Have we decided that issue, the fast track issue? Yes, Your Honor. I think all of the courts, all of the circuits, and I'm not sure I had cited to a Ninth Circuit case, but I think all of the circuits that have looked at the fast track program, which is authorized by the Attorney General, if you're talking about the 1326 context, have determined that it is a perfectly acceptable and constitutional. So there's been no issue regarding fast track. As long as the defendant can turn it down. Yes. And I think part of the – one thing I haven't raised, which I think is critical again to Bordenkercher and to this situation, which is Bordenkercher was concerned with the notion that the defendant is not left in a worse position, having rejected the offer, than he would have been initially. And here, of course, the prosecutor could have simply just charged it out of the box. He could have said, 851 prior, charge it and work down. So the fact that he flipped that, I don't see how the district court's conclusion that that somehow affected the truth-seeking process is sustainable. Can I tell you what really bothers me here? Judge Patel is the former chief judge of the Northern District. She's a very experienced judge. If she – and she knew she didn't have any precedent. So she very deliberately made the ruling in this case and the Jones case. So how do you explain that? I think, Your Honor, that she was under, as I said earlier, under a misimpression about what Bordenkercher actually requires, which is this notion of haggling. If you go through the records, she repeatedly asked Mr. Wynne, who was Morris's attorney, whether or not he made a counteroffer. He repeatedly asked whether or not the – whether or not there was any give-and-take between the prosecutor on what the offer was. Unfortunately, Bordenkercher basically stands for the proposition that the prosecutors can do exactly what they did here, which is make a give-it-take-it-or-leave-it offer. And as a logical matter, I think that makes sense. The prosecutor is under no obligation to retreat from its initial or – its initial offer or soften it, particularly given the Supreme Court has said that the defendant isn't even entitled to a plea offer at all under the Constitution. So I think the Court was just concerned about actually the language in Bordenkercher. I also think, Your Honor, that she was concerned about the notion – to some extent the notion of cooperation. But overall, I think it's a little bit perplexing, to tell you the truth, why she didn't obstruct the A51 prior in Morris. I'd like to reserve the remainder of my time for rebuttal. Thank you very much. Welcome back. I would have been in no shape on Monday morning. Glad you made it. Thank you again. My name is Paul Wolfe, and I'll be representing Mr. Morris here. Your Honor, Judge Patel, Your Honors, excuse me, may it please the Court. Judge Patel did not misunderstand Bordenkercher. If you read the two decisions, the two memorandum orders in this case, it's very clear that she has analyzed Bordenkercher to a T and shown exactly why this due process violation does not and cannot fit Bordenkercher. What exactly did they do wrong here? What do I think is wrong here? What did they do wrong? They have the right to charge your guy with both the underlying crime and the allegation of the prior. Right. Okay, so that's okay. They don't have to offer him a plea deal. But they never offered him two things they did wrong, primarily. They never offered him anything. Did they have to offer him anything? They don't have to. Okay. But in this case, what they did is they said to him, immediately, you've got to give up all your rights. Don't make a motion to be released. We're not going to you're under this incredible time constraint. In this case, this is a very unusual case, Your Honor. Your Honor, this is not going to come again. This is the progeny, if you will, or the creation of the creation of a prior's policy in this office, in the office of the attorney, of the U.S. attorney in this district, that was very regrettable and has now been discontinued and hopefully never will come again. I'm still having a hard time zeroing in on what I've asked you. They don't have to offer him a plea deal. And you told me they have the right to charge him with what they charge him. So exactly what did they do wrong? What they did wrong was they denied him they basically said to him, they denied him his right as in Bordenkercher. The exception is that he did what's different from Bordenkercher is that he did not have an opportunity to consider with counsel what was being told to him. And so, therefore, there wasn't a any kind of give and take. There was nothing really to take. What kind of give and take are you envisioning? Well, the give and take, if there had been, as the prosecution wants you to believe, the government wants you to believe, plea agreement and plea they're trying to defend this on the basis of Bordenkercher. And it simply isn't Bordenkercher because the give and take would have been, you know, the opportunity to appraise the case and then come back and say to the prosecution, listen, I'd like to make a deal with you. Maybe he wouldn't have gotten it, but here he never had that opportunity. He never had the opportunity to appraise what was being offered. I don't quite understand. The offer was made by the government to the lawyer on December 18. It was reiterated on January 23. There was a lot of time in there for the lawyer to talk with the client. But he did testify that he wasn't able to do that. All he was able to do was to get some discovery, review some discovery, and perhaps identify an informant. But with this, he can always turn it down. There's no problem. He can just say, I don't have time to do this. We'll turn down the deal. That's fine. But I don't understand why, if nearly over a month passes between the time the government makes an offer and the time they reiterate it, and then they say, look, you've got to tell me in seven days, there's a lot of time, a lot more time. And at all times, the defendant can turn it down and say, I don't know enough about it. So I don't get the real pressure on this when you see these fast-track cases going through, which we approved in Gonzales. Well, in this case, I just don't think he was provided with adequate information in order to affect his right to counsel. I think that that's what she does is notice that he has a claim that he can make on inadequate counsel. But I don't see the problem with the government. That's what we're looking at. Now, she dismissed the case not based upon what his lawyer did, but what the government did. And I'm having difficulty when you have over a month going on between the time the government makes the offer, and they're pressed because the murder case is coming up. But the pressing there and the timing of that was something that they created. The U.S. attorney in this case who actually made the offer had also been in charge of the murder case since, I think his declaration says since March of 2007. So to say we have this pressure of time, which is basically what's being borne upon the man and his lawyer. And I think the important place to look is in one of the other cases. I'm sorry, Your Honor. The important place to look is in the testimony of Ken Wine, an experienced defense lawyer here who said this never happened to him before. It immediately destroyed his relationship with the client or certainly interfered with it. It's all there in the testimony that he gave in response to my questions, the prosecutor's questions, and Judge Patel's questions. And that what was being offered really was nothing different. It's different from Bordenkircher because all we're offered here is the possibility. They come at you with pretty much a ultimatum to come and make an audition to see if you might be able to become a cooperator. And what do you have to do then? You have to give up all your issues. You're moving from one issue to another a little quickly. I'm sorry. Let's focus on the time. Is there anything wrong with the time and situation here on the government's part where over a month goes on from the time they first made the offer, and after they reiterated they gave another week, is there something constitutionally wrong with that? I don't know that there's something constitutionally wrong with the period of time. That was raised in the order by Judge Patel because the government sought to distinguish Morris from the Jones case by saying we were under these time restrictions. Okay. But what happened during that period was that there was nothing wrong here. I suppose with the threat that we'll get we're going after you for 20, you have a right to do it, rather than 10, unless you come along with a plea bargain. Is there anything wrong with that? Well, if there was a plea bargain, the cases both in the Supreme Court and in this circuit would uphold it. But Bordenkircher was five to life, so this is not a bad thing. Actually, Bordenkircher was misstated slightly. He originally was looking at five to 10. And I don't know why the prosecutor can draw from that opinion that they went to the plea bargaining immediately after arraignment. The decision simply says that after arraignment, they appeared before the clerk and there were discussions. I think a reasonable inference is he had his retained lawyer there. That's in the record. And they had an opportunity to consider the case, to know their circumstances. And just as Bordenkircher says, and it's very clear, and Judge Patel says that's not what happened here, she did not misunderstand Bordenkircher. When she says that's not what happened here, was she saying there should have been more time given or there was a problem between the defense lawyer and the defendant? There shouldn't have been that. She was concerned about all of that. She was concerned that at the very outset of the case, you come in, you've just met your client, and this is part of the record, too. You've just met a young man who is your client, and you're court-appointed. It looks like you can get him out, and when you're just about to get him out, you snatch it away because you make this ultimatum and you're offering really nothing except the possibility if you satisfy us. And this is what is completely distinguishable from the case Bordenkircher and the other cases that have been cited by the government. And Judge Patel dealt with all of them in her order. She understood them and she dealt with them. She said you can't come at that time and say, if you do anything to affect your rights, your Fourth Amendment rights, most importantly your Fifth Amendment rights, your Sixth Amendment rights were interfered with here, not perhaps as strong, but we put in our brief the Eighth Amendment rights were interfered with, and immediately everything is skewed. It is overbearing. It is not level. It is not give and take. It is not something that he knows and understands. They said this is our firm deal. This is our firm deal. Take it or leave it. But he has a right to leave it, to say no. He doesn't have a constitutional right to plea bargain. He can say to the government, no, I don't want to talk to you. But that's not what he's offered. That is not Bordenkircher or the other decisions. What he was offered was the possibility that you might get a deal if you can satisfy us, and it's completely at our discretion. And it was testified to by Ken Wine extensively as to what this process, what this 5K process is. But it is nothing other than the possibility. And if the government isn't satisfied either at the inception or subsequent to your plea, you're going to lose all your Fifth Amendment rights. You're going to dig yourself into an impossible hole. You've seen more of these than I have. But I have yet to see one when the government tied in cooperation that they didn't require him to tell the truth and cooperate in the case in which he's going to testify. Yeah. But he actually, it's very clear what they say is the proper agreement, which is 69, page 69 of the clerk's record. It's in there. It says we decide whether you've told the truth. That's right. And they actually say not that only do you have to tell the truth. That's what the proffer says. But in the colloquy or examination between the AUSA and Mr. Frenson and Mr. Wine, he says we'd have to be satisfied. These 5K1 things are upheld all the time. Well, they are. Okay. But not when they're applied. I keep asking you what did they do wrong, and you tick off these things, and every one of them says they're entitled to do. Well, but what they're not entitled to do is this priors policy because, just as Judge Patel found after 35 years of sitting on the bench, is that this is conduct that denies due process. It is not in the Borden-Kirscher exception. We go back to the first principles. This is a case of first impression. And what was wrong was coming at that time, under the time limitation, I know it didn't get extended for six weeks, but the pressure immediately, you have to do this before you do anything else. You've got to come to us, waive your Fifth Amendment right, tell us everything we want to hear, the most expansive violation, excuse me, waiver of your Fifth Amendment right to remain silent. And after you do that, we'll let you know if it's okay. And if it's not okay, you are done. And what also is inferred here is there was never going to be a chance to revisit this because we've the only thing we want you for is this trial. And there was no opportunity for him to decide to really get into Borden-Kirscher and these fair plea negotiations that don't violate the Fifth Amendment. So if you were in the prosecutor's shoes, would they really, in retrospect, what they should have done is not bother to have any kind of discussion at all. They should have gone ahead and filed the prior. They could have done that. Okay. There's no doubt. And then offer your guy nothing. Well, I don't think that's what they would have done. I think they would have contacted him. Well, but that's what you would have them do, right? No, what I would have them do in this case, because this is such an unusual case, it's not going to happen again, and it's the timing that really stinks and violates  Well, it happened to Jones. It happened to Jones, too. Well, it did, but it didn't happen to Jones in the same way because they didn't have the time pressure. They knew apparently about Morris months and months earlier. The charges, the ultimate, the first brought against him were in April of 2008. They don't bring them until December 2008. All of a sudden, we've got this huge rush. So what they should have done is when they discovered him, thought he might, excuse me, Your Honor. What was the interference with counsel? You mentioned that, but how did it interfere with Wine testifies to it. He says, it never happened to me, 15 years of doing these cases, mostly court-appointed, of this exact nature. All of a sudden, I'm here with the client I've just met three days earlier. Here we are the second time. We're going to try to get him out of jail. We've got a good recommendation, and boom. Now I don't know what to do. I can't decide whether he's going to do it on a double his basis. And I don't understand double his minimum. So I need to talk to him. Then you go and tell him you can't make your motion. Oh, you can't make any motions. Oh, what they want you to do is testify against this fellow. You think we have information. Well, is that the only thing I can do, Mr. Wine? And he says, we were in a terrible spot. We were unable to cooperate, communicate. We didn't know what to do. We were both frozen. And clearly, even though there were six weeks, he was not able to ever reconstruct the relationship. And I think there's reasonable inference from everything. He said, my client, my current client, wouldn't even see his former lawyer. I have two questions I want to ask you. Please. First, did the defendant have a constitutional right to plea bargaining? I don't think he has a constitutional right. I don't think he does either.      I don't think he does either. I don't think he does either. Okay. Secondly, a lot of the charges here are against the lawyer, the defense lawyer, that wasn't able to move the product along in five or six weeks. Has a 2255 action been brought against him? The case isn't over, Your Honor. It's still pending. And so nothing is due yet. Nothing has been filed yet. But you raise a good point. If the only way that we can turn your decisions into further litigation is if you do say these kind of policies, these prior policies and this kind of approach in a case like this is okay, shrewd and experienced defense lawyers, rather than be removed from their job and not be able to do it and help someone they've just meet decide such a serious, make such a serious decision so quickly, they'll simply say, go ahead, take the deal, because if it goes south, we definitely are going to have a really good 2255. Thank you. Thank you. Well, Erie, I think you get the last word. You have a couple of minutes left, I believe. Thank you, Your Honor. I just want to raise a couple of points. One is that just for purposes of the factual record in the Bordenkercher case, there was 20 days between the first indictment and the second indictment. So it was a very short period of time. And the offer was made after the arraignment is what the facts showed. How much time did they have in this case? It was about seven weeks from the time the initial offer was made until the time the government filed the 851 information. So a lot longer period of time in this particular case. Secondly, I think I take issue with my colleague's claim that this is an unusual circumstance. I think that, in fact, this is a almost daily occurrence across the country where prosecutors are confronting defendants and asking them to either cooperate or to plead guilty to charges or they will threaten them. I think he was basing that on the lawyer's testimony. It had never happened to him before. And I think that may very well be true, that it is the use of the 851 priors or information was not all that frequent. But in this particular case, it was particularly compelling, given the fact that we needed Mr. Morris's testimony in the Cyrus case. Also, just lastly, on that urgency point, there's a factual error in the district court's order. The case was indicted in December of 2008, not 2009. And so it was only about eight months after the offense actually occurred that Mr. Morris was indicted. And, in fact, the prosecutor explained in his declaration to the court that the reason for the delay in that had to do with the maintaining the identity of the confidential informant so that he had not yet been identified. So I think all of those reasons actually do not hold water. We would ask that the Court reverse the district court. Thank you very much. Thank you. Thank you, Mr. Chief Justice. The case has started. You just submitted. Good morning.
judges: Wallace, Noonan, Silverman